IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

GLORIA JEAN BURNS )
)
v. )     No. 3:14-1817
)     Judge Sharp/Bryant
SOCIAL SECURITY ADMINISTRATION )

To:     The Honorable Kevin Sharp, Chief Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration") denying plaintiff's applications for disability insurance benefits and

supplemental security income, as provided under Titles II and XVI of the Social Security Act.

The case is currently pending on plaintiff's motion for judgment on the administrative record

(Docket Entry No. 12), to which defendant has responded (Docket Entry No. 15).  Plaintiff

has further filed a reply in support of her motion.  (Docket Entry No. 16)  Upon

consideration of these papers and the transcript of the administrative record (Docket Entry

No. 10),[1] and for the reasons given below, the undersigned recommends that plaintiff's

motion for judgment be GRANTED and that the decision of the SSA be REVERSED and the

cause REMANDED for further administrative proceedings consistent with this Report, to

include rehearing.

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her applications for benefits in December 2010, alleging disability onset as of December 31, 2008 (Tr. 133-45)  Her applications were denied at the initial and reconsideration stages of state agency review.  Plaintiff subsequently requested *de novo* review of her case by an Administrative Law Judge (ALJ).  The case came to be heard by the ALJ on February 7, 2013, when plaintiff appeared with counsel and gave testimony.  (Tr. 38-70)  Testimony was also received from an impartial vocational expert.  At the conclusion of the hearing, the ALJ took the matter under advisement until March 26, 2013, when she issued a written decision finding plaintiff not disabled.  (Tr. 13-31)  That decision contains the following enumerated findings:

1.  The claimant met the insured status requirements of the Social Security Act through December 31, 2012 (Exhibit 4D).

2.  The claimant has not engaged in substantial gainful activity since December 31, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  depression; pancreatitis; and Morton's neuroma (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) that is limited to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; standing, walking, and/or sitting six hours each in an eight-hour workday with a sit/stand at will option; and occasionally climbing ramps/stairs but never climbing ladders/ropes/scaffolds.  In addition, the claimant can understand, remember, and carry out simple and lower level detailed (1-3 step) tasks, but cannot make

independent decisions at an executive level. She can maintain concentration, persistence, and pace for simple tasks and low-level detailed tasks but not higher-level, multi-step detailed tasks. She can interact appropriately with the general public, coworkers, and supervisors, and she can adapt to infrequent change.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 29, 1960, and was 48 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-18, 29-30)

On July 7, 2014, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II.  Review of the Record

The following summary of the medical evidence in this case is taken from plaintiff's brief, Docket Entry No. 12-1 at pp. 4-13.  In addition to this summary, additional discussion of the facts pertinent to the legal issues at hand is contained in the Conclusions of Law, below.

On the alleged onset date of December 31, 2008, Plaintiff was 48 years old. T 151. She reported that she obtained a GED. T 155. Plaintiff reported past work as a caretaker, cashier and a housekeeper. T 156. Plaintiff's date last insured was December 31, 2012. T 149.

### A. Medical Records

**Wilson County Health Department**

On March 1, 2007, Margaret Baggett R.N. examined Plaintiff and found that she was depressed. Plaintiff also complained of sharp stabbing pain in her abdomen. T 256. The nurse also observed that Plaintiff had lesions on her body. T 253.

On April 26, 2007, Plaintiff complained of pain in her left foot. T 250. On May 7, 2007, Plaintiff had a human Papilloma virus test and she was advised to have further testing. T 242. On June 7, 2007, a nurse examined Plaintiff and found that she had abscesses on her buttocks. The nurse prescribed bacterium. T243. The examination also revealed cervical tenderness. T 243.

On March 11, 2008, a nurse examined Plaintiff and she complained that she had constant headaches, night sweats and bone pain. The nurse observed that Plaintiff had edema in her feet and she had difficulty walking. Plaintiff also indicated that she had numbness and tingling in her feet. T 248. The nurse also indicated that Plaintiff had a depressed mood. T 246.

In June, July and August 2008, Plaintiff was treated for ongoing pain in her feet and legs.

Plaintiff was diagnosed with Morton's Neuroma[2] and severe swelling. T 240. The physician observed that Plaintiff walked with a limp as well. T 240.

On July 10, 2008, a nurse examined Plaintiff and opined that she had muscular pain and a headache. T 243. On March 5, 2007, Plaintiff was advised by the health clinic that she had an abnormal Pap smear. T 242.

On October 29, 2009, Plaintiff was examined and the physician noted that she had ongoing bilateral distal foot pain which seems to radiate into both feet and ankles. The physician noted that Plaintiff had been diagnosed with Morton's neuroma bilaterally. Plaintiff was being treated with Neurontin and was only able to tolerate 300 mg. b.i.d. The physician indicated that Plaintiff experienced side effects at the higher dosages. Unfortunately, the lower dose did not relieve Plaintiff's pain and she had not been taking the medication. The physician further noted that Plaintiff had occasions in which she experienced numbness in her left upper and lower extremity. The physician indicated that these episodes included disturbances in Plaintiff's vision on the left. Plaintiff described the phenomenon as not being able to see out of her left eye even though she knew it was open. According to Plaintiff the sensation seemed to last five to ten minutes and then resolve. T 234.

The physician noted that Plaintiff's objective vital signs were stable. Her cranial nerves two through twelve were intact. Plaintiff's lower extremities were without edema. Muscle testing was 5/5 in all groups and reflexes were 3/4 in all areas. The physician observed that palpation between the second and third digits of Plaintiff's feet caused her discomfort and there was a very distinct lesion consistent with Morton's neuroma on her right foot. She was reluctant to walk because of pain, but was able to heel walk without problems. The physician opined that Plaintiff's bilateral foot pain was associated with Morton's neuroma. The physician further

---

[2]Morton's [neuroma], a tumor growing from a nerve or made up largely of nerve cells. Dorland's Illustrated Medical Dictionary ("Dorland's") 1181, 1266 (32nd ed. 2007).

observed that Plaintiff had intermittent dysesthesias and numbness. The physician opined that Plaintiff might be having small strokes. T 234.

On September 10, 2010, Plaintiff was examined and found to have abdominal pain. The physician observed that Plaintiff's gait was slow and antalgic. T 235. On September 24, 2010, Plaintiff was diagnosed with late stage syphilis. T 232.

On October 26, 2010, Plaintiff was examined at University Hospital. T 350. The physician noted that palpation of Plaintiff's abdomen elicited tenderness, in the right upper quadrant. Plaintiff rated her pain as nine on a one-to-ten scale with ten being the worst pain ever. Plaintiff described the pain as burning and sharp. Plaintiff also complained of diarrhea T 350. Plaintiff was diagnosed with acute Pancreatitis. T 353. A CAT scan confirmed that Plaintiff had diverticulosis and degenerative changes to her lumbar spine. T 355.

On December 1, 2010, Plaintiff was admitted to the University Medical Center for abdominal pain. T 338. Plaintiff also complained of significant diarrhea. T 338. Plaintiff described the pain as aching, sharp and stabbing. The physician noted that Plaintiff's pain was exacerbated by nothing and was improved or comforted by nothing. T 338. Plaintiff also complained of vomiting. T 338. Plaintiff was treated with Zofran. Plaintiff's record also noted that she had three episodes of rectal bleeding. T 340. Dr. Jack Friday opined that a CAT scan of Plaintiff's abdomen confirmed that Plaintiff had mild mesenteric adenitis, descending, sigmoid diverticulosis and discrete evidence of diverticulitis. T 348. The scan also found that Plaintiff had

a left renal cyst. T 349.

On December 3, 2010, a nurse again examined Plaintiff. Plaintiff complained of rectal bleeding, pancreatitis, and dehydration. T 244. On December 16, 2010, a nurse examined Plaintiff and noted that Plaintiff was from an emotional stand point less irritable. T 230.

On January 25, 2011, a nurse examined Plaintiff and observed that Plaintiff was

depressed. The nurse next noted that Plaintiff had chronic Pancreatitis. T 231.

On May 6, 2011, a nurse examined Plaintiff and opined that Plaintiff had headaches and she was complaining of memory loss. Plaintiff explained that she had black outs or a dissociative episode. Plaintiff's employer advised her that she had been driving a company vehicle and wrecked it. Plaintiff had no memory of these events. The nurse also observed that Plaintiff had difficulty walking when she was upset but she moved more smoothly when she relaxed. The nurse opined that Plaintiff might have syncope. Plaintiff was referred to neurology and advised that she could not drive until she has been cleared by a neurologist. T 288.

On May 20, 2011, a nurse examined Plaintiff and opined that she had some muscular tenderness. T 314. On June 8, 2011, a nurse practitioner from Middle Tennessee Mental Health noted that Plaintiff was having flash backs of her abuse as a child. Plaintiff was found in the middle of a public street wearing her pajamas. The nurse noted that Plaintiff was depressed and may have some amnesia. T 317. Plaintiff expressed a fear of harming herself. T 318. Mental health professionals from a mobile crisis center noted that Plaintiff had a history of self-injurious behavior citing suicide attempts in 1989 and 1999. Plaintiff was diagnosed with posttraumatic stress disorder. T 318. Plaintiff was taken to University Medical Center and she was placed on a suicide watch. T 330, 333. A physician diagnosed Plaintiff with acute depression, anxiety and suicidal ideations. T 336.

On July 9, 2011, Plaintiff was admitted to the University Medical Center. Plaintiff indicated that she was in pain and rated it at a nine out of ten. Plaintiff explained that the pain was in her abdomen and her mid back. T 323. The physician indicated that Plaintiff's symptoms were the result of her chronic pancreatitis. T 325. The physician next noted that Plaintiff had a major depressive disorder with suicidal ideations. T 326.

On January 19, 2012, Plaintiff was examined and she complained of continuing shoulder and bilateral knee pain. T 387. The physician noted that Plaintiff's gait was antalgic. T 387.

On November 1, 2012, Plaintiff was examined and found to have symptoms of gastroesophageal reflux (GERD) and depression. T 384. Plaintiff was re-examined again on December 9, 2012. T 384. On April 19, 2012, Plaintiff was examined and she complained of pain in her left shoulder. T 385-386.

On January 9, 2014, Plaintiff was advised that she was approved for Neurontin through a free service. T 241. Neurontin was prescribed for Plaintiff's nerve pain in her foot and leg. T 241.

**Plaintiff's Psychiatric Records**

On July 15, 2011, the Volunteer Behavioral Health Care System treated Plaintiff's psychiatric disorder by providing case management services and therapy with a licensed social worker. T 555, 559, 561.

On October 17, 2011, Plaintiff reported to her case manager that she was still having difficulty sleeping and the case manager noted that Plaintiff appeared nervous. T 513. Plaintiff's affect was noted as flat and her mood was dysphoric. T 514. Plaintiff was diagnosed with a recurrent major depressive disorder with psychotic features. T 515. Plaintiff's medications were Remeron, Zyprexa, and Trazodone. T 515-516.

On July 15, 2011 Plaintiff was evaluated by her case manager and the case manager noted that Plaintiff was like a roller coaster. Plaintiff stated she was happy, and then she got sad or angry. Plaintiff stated she coped by letting it go and crying. Plaintiff reported that she thought about her problems from her childhood. Plaintiff stated she and her sisters were molested by her father, her step-father and a cousin. Plaintiff stated she still had nightmares about the events. Plaintiff also reported that she wanted to feel independent again. T 397

On July 25, 2012 Plaintiff reported she was really tired. Plaintiff stated that her medicine kicked in when she was ready to wake up. Plaintiff reported she wakes up depressed and crying.

On September 22, 2011, the case manager reported that Plaintiff was currently taking all

of her medications as prescribed. Plaintiff reported that her medicine sometimes made her feel a little nervous. The case manager also noted that Plaintiff had kept all scheduled appointments with her medical providers. T 411. On October 17, 2011, Plaintiff reported to her case manager that she was still having difficulty sleeping and the case manager observed that Plaintiff appeared nervous. T 513. Plaintiff's affect was noted as flat and her mood was dysphoric. T 514. Plaintiff's medications were Remeron, Zyprexa, and Trazodone. T 515-516. Plaintiff's Global Assessment of functioning (GAF) was 45. T 520.

On November 2, 2011, Plaintiff reported she was currently taking all of her medications as prescribed. Plaintiff reported to her case manager that her medications were helping her but she believed the medications were being over prescribed. Plaintiff also reported that her medications made her feel as if she did not have any emotions. T 417. On January 19, 2012, Plaintiff was examined and a physician opined that she had an impingement with limited range of motion in her left shoulder and weakness in both knees. T 387.

On March 15, 2012, a case manager noted that Plaintiff was having difficulty sleeping. T 421. Plaintiff reported she was doing ok but tended to get depressed. T 461.

On April 2, 2012, Plaintiff advised her case manager that she was feeling better but she had been having side effects from her medication. T 484. On April 17, Plaintiff reported being stressed but that her medications were helping except she still had insomnia. Plaintiff also reported that her medications helped with her mood swings and stopped her from hearing voices. T 487. Plaintiff explained further that she spent time pacing the floor when she was under stress. T 487.

On May 29, 2012, Plaintiff reported that she had been working to control her mood swings but she still had great difficulty sleeping. T 445.

On June 6, 2012, Plaintiff reported that she was doing ok with the help of the medication. Plaintiff also reported that she had been having issues with her knees and stomach, which caused

her to become stressed and depressed. T 448. On June 19, 2012, Plaintiff reported that she was depressed and tired all the time. Plaintiff's case manager noted that her fatigue increased with her

depression. T 451.

On July 24, 2012, Plaintiff reported to her case manager that she was very stressed. On August 9, 2012, Plaintiff's case manager noted that Plaintiff looked very tired. T 463.

On August 22, 2012, Plaintiff reported to her case manager that Amitriptyline was not helping her sleep. Plaintiff said she was stressed and on edge. T 530.

On September 18, 2012, Plaintiff continued to complain that she was not sleeping. She reported she woke up every hour during the night. Plaintiff reported that she was able to sleep a couple hours in the afternoon. T471.

On October 3, 2012, Plaintiff was taken off Amitriptyline and put on Seroquel. Plaintiff reported that she had been on medication for almost two weeks and it had not helped her sleep. Plaintiff's case manager encouraged her to give the medication a little more time. T 474.

On October 24, 2012, Plaintiff's sleep had improved. Plaintiff reported that she was getting 6-7 hours sleep a night. Plaintiff also reported that she had been having mood swings lately and got angry over nothing. T 479.

On November 29, 2012, Plaintiff advised her case manager that she wasn't sleeping. The case manager observed that Plaintiff had some mood swings, irritability, and depression. T 534.

On December 11, 2012, Plaintiff reported she had been taking her medication daily as prescribed except for Vistaril. Plaintiff reported she had stopped taking the Vistaril because it was not working for her. Plaintiff reported waking up sick, with vomiting and diarrhea. Plaintiff also reported she got excited or nervous "over any silly little thing" and she had panic attacks. Plaintiff reported she also had mood swings twice a week. T 486.

**Hearing Testimony**

At the hearing, Plaintiff testified to the following: Plaintiff stated that she was 53 years old and indicated that she turned 50 in 2010. T 39. Plaintiff also indicated that she completed the eleventh grade and later obtained a GED. T 42-43. Plaintiff testified that she could stand for 15 minutes before she needed to stop and sit down. T 44. Plaintiff explained that after 15 minutes her back and her feet began to hurt. T 44. Plaintiff next explained that she was not able to lift more than 5 or 10 pounds because of her shoulder injury. T 44. Plaintiff next stated that she had no health insurance. T 44. Plaintiff next explained that she had black outs and she tried to commit suicide. T 46. Plaintiff also testified she had chronic pancreatitis and her abdomen was distended. T 46. Plaintiff next explained that she was in constant pain. T 46. Plaintiff next testified that sometimes the pain was bearable and sometimes it was unbearable. T 47. Next, Plaintiff said that her depression caused her to be unable to focus. Plaintiff said that she could focus for only 10 or 15 minutes and she was unable to finish what she started. T 47-48. Plaintiff described her attention as in and out. Plaintiff testified that she was often depressed and stayed in bed. T 47. Plaintiff next explained that in a 30 day period she stayed in bed for a week and a half. T 48. Plaintiff next testified that she did not like being around people and she had panic attacks. T 48.

When discussing her daily activities she stated that she could often start a task but could not finish it. T 49. Plaintiff next testified that she currently lived with a friend and before that she was homeless. T 52. Next, Plaintiff explained that her medication caused side-effects of drowsiness and dry mouth. T 53.

Next, Plaintiff's friend Ms. Jackman, testified that Plaintiff used to do housework with her but she had to let Plaintiff go because Plaintiff could not perform the tasks required. T 54-55. Ms. Jackman next explained to the ALJ that Plaintiff had constant problems when she tried to work. Ms. Jackman next described the fact that Plaintiff was not able to see well and she was unable to read labels. T 56-57.

**Vocational Expert Testimony**

A vocational expert (VE) testified at the hearing. The VE testified that Plaintiff's past relevant work was as a fast food worker, Dictionary of Occupational Titles (DOT) # 311.472-010. T 63. The VE testified that given the ALJ's hypothetical an individual with the same age and education would be unable to perform Plaintiff's past relevant work. T 64-65. Next, the VE testified that an individual with Plaintiff's RFC could perform work as a sales attendant, DOT 299.677-010, unskilled light work; a cashier, DOT 211.462-010, unskilled light work; and a furniture rental consultant, DOT 295.357-018 also unskilled light work. T 64-65. The VE also testified that an individual with the RFC and additional restrictions of only occasionally carrying out even simple instructions, who was unable to interact with others, and who could only occasionally tolerate work stress would be unable to perform work. T 65-66.

## III. Conclusions of Law

### A. <u>Standard of Review</u>

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. <u>Elam ex rel. Golay v. Comm'r of Soc. Sec.</u>, 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 241 (6th Cir. 2007)(quoting <u>Cutlip v. Sec'y of Health & Human Servs.</u>, 25 F.3d 284, 286 (6th Cir. 1994)). Even if the record contains substantial evidence that could have supported an opposite conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. <u>E.g.</u>, <u>Longworth v. Comm'r of Soc. Sec.</u>, 402 F.3d 591, 595 (6th Cir.

2005). Accordingly, while this court considers the record as a whole in determining whether the SSA's decision is substantially supported, it may not review the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. See Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007); Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

## B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in her determination of plaintiff's residual

functional capacity, in her determination of plaintiff's credibility, and in her questioning of the vocational expert (VE) with a hypothetical which did not contain the full description of plaintiff's limitations.  As explained below, in light of an apparent discrepancy in the ALJ's formulation of plaintiff's mental RFC, and considering the VE's testimony in response to plaintiff's counsel's questioning, the undersigned finds that the ALJ's decision is not substantially supported, and that remand for further fact-finding is in order.  While plaintiff also claims error in the ALJ's determination of her RFC as it relates to her credibility and her chronic physical conditions, the undersigned has not addressed these issues in this Report; however, in view of the errors discussed below, these matters too may be addressed again before the agency.

In determining plaintiff's mental work-related limitations, the ALJ noted that there was no treating source opinion in the record (Tr. 24), and therefore focused her attention on the two consultative examinations in the record and the two assessments from nonexamining consultants engaged by the state agency.  On April 20, 2011, plaintiff was seen by Dr. Linda Blazina, Ph.D., at the request of the state agency.  Dr. Blazina noted that plaintiff was disheveled with apparently marginal hygiene, and that plaintiff reported being abused as a child and feeling that said abuse contributed to her present symptoms.  (Tr. 266-67)  Dr. Blazina diagnosed dysthymic disorder (a mild but persistent form of depression).  Based upon her clinical interview and mental status examination, she concluded only that plaintiff's "social interaction abilities appeared to be mildly impaired" which "might be an issue in terms of being able to interact with others in a stable fashion," and that her ability to adapt to change in work routine and tolerate normal workplace stress is also "likely to be mildly impaired."  (Tr. 269)  On May 3, 2011, a nonexamining consultant, Dr. Sachs, opined

that, based on Dr. Blazina's assessment, plaintiff had no severe mental impairment. (Tr. 274-87) The ALJ gave these opinions "limited weight," inasmuch as the other evidence of plaintiff's mental health indicated moderate limitations. (Tr. 25)

In conjunction with plaintiff's request for reconsideration of the state agency's initial denial of her claim, new mental health evidence was introduced containing a new diagnosis of posttraumatic stress disorder (PTSD), which was made following an apparent suicide attempt and which provoked the reviewing consultant, Dr. Jayne Dubois, Ph.D., to order a new consultative examination. (Tr. 363-64) On September 21, 2011, plaintiff was seen by licensed senior psychological examiner Marie E. La Vasque, and by psychologist Susan R. Vaught, Ph.D, who performed a clinical interview and mental status evaluation, as well as several psychological tests. (Tr. 217-20) (referred to *supra* as Dr. Vaught's report/opinion). Dr. Vaught documented plaintiff's report of being abused as a child and raped as an adult, and noted that "[s]he described symptoms consistent with moderate to severe anxiety and mild to moderate depression." (Tr. 217) She further noted plaintiff's report of "onset of alcohol abuse at age 13 and continuing with severe abuse and alcohol addiction for 32 years," until March 2011 when she quit drinking. Id. On this subject, Dr. Vaught further related that

> Ms. Burns reported that she drank heavily for multiple years saying "I liked drinking cause I didn't have no feelin's." She referred to herself as an alcoholic and said that she stopped drinking when she began having severe delirium tremens (DT's) when she was not intoxicated. ... According to Ms. Burns, she had been able to keep memories of her childhood abuse at bay when drinking and when she quit, "now everything is biting me in the butt."

(Tr. 218) Plaintiff "reported being hospitalized in June of 2011 at the Crisis Center after

16

presenting to the emergency room frightened after 'waking up with pills around me and had vomited on myself.'" (Tr. 219)  Dr. Vaught noted that plaintiff's "[v]isual motor integration[3] was poor as demonstrated by crashing, distortion, and perseveration on the Bender [Visual Motor Gestalt Test] and the possibility of Substance-Induced Persisting Dementia cannot be ruled out considering her risk factors." (Tr. 218)  It was further noted that plaintiff "did not provide an effective solution to a simple social dilemma," and that her judgment appeared to be limited but fair.  Id.  Dr. Vaught found that "[o]verall, within a structured setting, her attention appeared to be intact, but her concentration appeared to be mildly impaired." Id. In testing plaintiff's memory functioning, she reported that plaintiff was able to recall one out of three items after a five-minute delay,  and that cues were successful in aiding her memory of the second item but not the third, leading to the conclusion that "[s]hort-term memory appeared mildly to moderately impaired." Id.  In summary, Dr. Vaught noted that "[s]ince she has stopped drinking she has begun to experience emotional distress related to a history of sexual abuse as a child and rape as an adult and she is scheduled to begin therapy later in September." (Tr. 219)  Dr. Vaught diagnosed Posttraumatic Stress Disorder; Alcohol Dependence, Early Full Remission; and Dissociative Identity Disorder, while also giving rule out diagnoses of Major Depressive Disorder (since episode, moderate) and Substance Abuse Persistent Dementia.  Id.  Dr. Vaught concluded with the following "Medical Source Opinion" as to plaintiff's functional ability:

> Ms. Burns appeared to be capable of understanding simple instructions, but it was necessary to simplify more complex instructions.  She demonstrated mild

---

[3]Visual-motor integration is the ability to integrate visual input with motor output, commonly referred to as hand-eye coordination.
http://www.visionandlearning.org/visualintegration08.html

short-term memory problems that in combination with her mood issues **could** moderately limit her ability to recall and perform even simple instructions. ... In a structured environment, Ms. Burns had difficulty carrying out instructions consistently. Her mood disorder **would likely** negatively impact her ability to maintain a consistent work schedule. ... Ms. Burns was able to interact appropriately with this examiner, but her judgment issues, lack of motivation, and PTSD symptoms **could** restrict her ability to interact appropriately with coworkers, supervisors, and/or the public. ... Ms. Burns described periods of isolation and difficulty making decisions. She appeared to have the ability to recognize and respond appropriately to hazards in the environment, but her coping skills appeared to [be] limited and she **would likely** have moderate to severe problems adapting to changes in routine and/or job requirements.

(Tr. 219-20) (emphasis supplied).

The ALJ found the above highlighted terms to create vagueness in the assessment of limitations that followed, contributing to their unreliability[4] -- with one

---

[4]Curiously, the ALJ found no such vagueness in the assessment of Dr. Blazina, who found that plaintiff's "social interaction abilities appeared to be mildly impaired ... and this might be an issue in terms of being able to interact with others in a stable fashion[,]" while "[h]er ability to adapt to change in work routine and tolerate normal workplace stress is also likely to be mildly impaired[.]" (Tr. 269) Moreover, the ALJ "specifically note[d] that only five months separate the two drastically different consultative examinations" and that "[t]he record contains little evidence during these five months upon which to base such restrictive, albeit vague, findings" as those reached by Dr. Vaught. (Tr. 26) It appears from Dr. Vaught's report that the explanation she would give for the difference is the new remission of plaintiff's lifelong alcohol addiction and subsequent revelation of her underlying PTSD, as referenced *infra*.

Moreover, in discounting the weight of Dr. Vaught's opinion, the ALJ stated that "[i]n September 2011, the month of the second more limiting consultative exam, the claimant was noncompliant with medication." (Tr. 26) However, the record confirms that plaintiff was forced to move from Lebanon to Mt. Juliet, Tennessee, leaving behind some possessions in her Lebanaon apartment and a prescription in the Lebanon office of her mental health care provider, as reported to her case manager on September 8, 2011. (Tr. 408-09) Four days later, on September 12, 2011, plaintiff was seen in the Mt. Juliet office by an advanced practice nurse, who noted plaintiff's report of auditory hallucinations, diagnosed Major Depressive Disorder, Recurrent, Severe with Psychotic Features, and prescribed multiple medications including an increased dose of Zyprexa for "psychosis, paranoia, mood stabilization, [and] anxiety[.]" (Tr. 508-12) It is thus a reach to call plaintiff

notable exception: "[T]he undersigned accords no weight to the vague, but seemingly severe limitations reported by the September 2011 consultative examiner; however, significant weight has been accorded to the moderate limitations reported in the claimant's ability to recall and perform simple instructions[.]" (Tr. 26)

The ALJ went on to give "great weight" to the assessment of the second nonexamining consultant, Dr. Dubois, who on October 28, 2011, adopted all of Dr. Vaught's diagnoses and gave "[g]reat weight" to Dr. Vaught's Medical Source Opinion, finding that this evidence and plaintiff's report of daily activities supported "[m]oderate overall limitations." (Tr. 378) In particular, Dr. Dubois deemed that such limitations support the assessment that plaintiff "can understand and remember/perform simple and lower-level detailed (1-3 step) tasks, but cannot make independent decisions at an executive level" -- an assessment that the ALJ adopted in her RFC finding. (Tr. 17, 382) Consistent with this assessment, Dr. Dubois found that plaintiff's ability to understand, remember, and carry out short and simple instructions was "not significantly limited," rather than "moderately limited." (Tr. 380)

Thus, despite giving "significant weight" to Dr. Vaught's assessment (which was based in part on testing of plaintiff's memory functioning) that plaintiff has moderate limitations in her ability to recall and perform even simple instructions (Tr. 26, 218-19), the ALJ adopted Dr. Dubois's assessment that such limitations were less than moderate, and indeed insignificant.

This discrepancy is a material one. At the hearing, plaintiff's counsel posed a

"noncompliant with medication" during the month of September 2011.

hypothetical question to the VE which incorporated Dr. Vaught's Medical Source Opinion, including the factor that "[i]n a structured environment, this individual would have difficulty carrying out instructions consistently." (Tr. 67) In response, the VE asked: "When you describe the difficulty carrying out instructions, would that be simple instructions?" Id. Counsel deferred to the wording of Dr. Vaught's opinion, which simply referred to "difficulty carrying out instructions consistently." The VE responded with the following testimony: "If it is simple instructions, then I don't believe there would be work available. If they're talking about detailed [instructions], and just on that part of the hypothetical, there would still be, you know, unskilled work available." (Tr. 68) Based on this testimony, it can plainly be argued that a moderate limitation in the ability to recall and perform simple job instructions would be disabling.

Further clarification of plaintiff's mental RFC and its impact on her ability to perform other work in the economy is needed. As these matters stand currently, the undersigned cannot find substantial evidentiary support for the ALJ's decision. It is recommended that the matter be remanded for further fact-finding, a new hearing, and the issuance of a new decision on plaintiff's claim.

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment be GRANTED and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this Report, to include rehearing.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 10th day of March, 2016.

 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE